**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF ILLINOIS**

| | |
|---|---|
| GREGORY BLACKWELL, individually and on behalf of all others similarly situated,<br><br>Plaintiff,<br><br>v.<br><br>ABBOTT LABORATORIES, INC. and EXACT SCIENCES CORPORATION,<br><br>Defendants. | Case No. 1:26-cv-10164<br><br>**JURY TRIAL DEMANDED**<br><br>**CLASS ACTION COMPLAINT** |

# CLASS ACTION COMPLAINT

Plaintiff, Gregory Blackwell ("Plaintiff"), individually and on behalf of all others similarly situated, brings this Class Action Complaint against Defendants Abbott Laboratories, Inc. ("Abbott") and Exact Sciences Corporation ("Exact Sciences" and together with Abbott, "Defendants"), seeking monetary damages, restitution, and injunctive relief arising from a data breach that resulted in the theft of Plaintiff's highly sensitive personal information. Plaintiff makes the following allegations upon personal knowledge and on information and belief derived from, among other things, investigation of their counsel, a review of public documents, and other facts that are a matter of public record.

## I. INTRODUCTION

1. This class action arises out of the recent data breach ("Data Breach") involving Defendants that compromised Plaintiff's and Class Members' personally identifiable information ("PII") and protected health information ("PHI", and together with "PII", "Private Information").

2. Defendant Abbott is a multinational healthcare and medical device company headquartered in Abbott Park, Illinois.

3. Defendant Exact Sciences is an American molecular diagnostics company based in Madison, Wisconsin, and maker of several at-home cancer screening exams, including Cologuard and Cancerguard. Defendant Exact Sciences is owned by Defendant Abbott.

4. Upon information and belief, on or around July 15, 2026, Defendants experienced a Data Breach. Since the Data Breach occurred, the notorious ransomware group "ShinyHunters" claimed responsibility for the Data Breach.[1]

5. ShinyHunters is a notorious black-hat cybercriminal group, believed to have formed in 2019.[2] ShinyHunters specializes in large-scale data breaches, extortion, and selling stolen user data on the dark web.

6. On July 16, 2026, Defendant Abbott published a statement on its website indicating it is "investigating a cyber incident."[3]

7. On August 5, 2026, Defendant Abbott reported the Data Breach to the Illinois Attorney General. Abbott discovered the breach on July 8, 2026.[4] According to Abbott, the number

[1] https://www.hookphish.com/blog/ransomware-group-shinyhunters-hits-abbott-owned-exact-sciences-corporation/ (last visited August 18, 2026).

[2] https://www.docontrol.io/blog/shinyhunters (last visited August 18, 2026).

[3] https://www.abbott.com/en-us/corpnewsroom/diagnostics-testing/abbott-statement-on-cyber-incident-in-cancer-diagnostics-business (last visited August 18, 2026).

[4] https://databreachnoticetoattorneygeneral.illinoisattorneygeneral.gov/portal/Workflow/Run?workflowId=g8b79c5d8-c80a-41eb-987c-27cb35a94332&ewd=hhujTRna%2bTzBe6WgHArOGC99ci3Cgf0NmRcCIQX10mlzyy5zts61a3rHxseGjCwP7%2fgbZg%3d%3d (last visited August 18, 2026).

of Illinois residents affected by the breach is unknown to Abbott and they have not provided notice to Illinois residents.[5]

8. Upon information and belief, customers are required to entrust Defendants, either directly or indirectly, with sensitive, non-public Private Information, without which Defendants could not perform their regular business activities. Defendants retain this information for many years and even after the customer relationships have ended.

9. By obtaining, collecting, using, and deriving a benefit from the Private Information of Plaintiff and Class Members, Defendants assumed legal and equitable duties to those individuals to protect and safeguard that information from unauthorized access and intrusion.

10. Defendants failed to adequately protect Plaintiff's and Class Members' Private Information. This unencrypted, unredacted Private Information was compromised due to Defendants' negligent and/or careless acts and omissions and their utter failure to protect Plaintiff's and Class Members' sensitive data. Hackers targeted and obtained Plaintiff's and Class Members' Private Information because of its value in exploiting and stealing the identities of Plaintiff and Class Members. The present and continuing risk of identity theft and fraud to victims of the Data Breach will remain for their respective lifetimes.

11. In breaching their duties to properly safeguard Plaintiff's and Class Members' Private Information and give them timely, adequate notice of the Data Breach's occurrence, Defendants' conduct amounts to negligence and recklessness and violates federal and state statutes.

12. Plaintiff brings this action on behalf of all persons whose Private Information was compromised as a result of Defendants' failure to: (i) adequately protect the Private Information

[5] *Id.*

of Plaintiff and Class Members; (ii) warn Plaintiff and Class Members of Defendants' inadequate information security practices; (iii) effectively secure hardware containing protected Private Information using reasonable and effective security procedures free of vulnerabilities and incidents. Defendants' conduct amounts at least to negligence and violates federal and state statutes.

13. Defendants disregarded the rights of Plaintiff and Class Members by intentionally, willfully, recklessly, or negligently failing to implement and maintain adequate and reasonable measures to ensure that the Private Information of Plaintiff and Class Members was safeguarded, failing to take available steps to prevent an unauthorized disclosure of data, and failing to follow applicable, required, and appropriate protocols, policies, and procedures regarding the encryption of data, even for internal use. As a result, the Private Information of Plaintiff and Class Members was compromised through disclosure to an unknown and unauthorized third party. Plaintiff and Class Members have a continuing interest in ensuring that their information is and remains safe, and they should be entitled to injunctive and other equitable relief.

14. Plaintiff and Class Members have suffered injury as a result of Defendants' conduct. These injuries include: (i) invasion of privacy; (ii) theft of their Private Information; (iii) lost or diminished value of Private Information and lost value of the unauthorized access to the Private Information permitted by Defendants; (iv) lost time associated with attempting to mitigate the actual consequences of the Data Breach; (v) loss of benefit of the bargain; (vi) lost opportunity costs associated with attempting to mitigate the actual consequences of the Data Breach; (vii) actual misuse of the compromised data consisting of an increase in spam calls, texts, and/or emails; (viii) nominal damages; and (ix) the continued and certainly increased risk to their Private Information, which: (a) remains unencrypted and available on the internet for unauthorized third

parties to access and abuse; and (b) remains backed up in Defendants possession and is subject to further unauthorized disclosures so long as Defendants fail to undertake appropriate and adequate measures to protect the Private Information.

15. As a result of Defendants' conduct, Plaintiff and Class Members now face an imminent and substantial risk of fraud, identity theft, and other harms caused by the unauthorized disclosure of their Private Information—risks which may last for the rest of their lives. Consequently, Plaintiff and Class Members must devote substantially more time, money, and energy to protect themselves, to the extent possible, from these crimes.

16. Plaintiff seeks to remedy these harms and prevent any future data compromise on behalf of himself, and all similarly situated persons whose personal data was compromised and stolen as a result of the Data Breach and who remain at risk due to Defendants' inadequate data security practices.

## II. PARTIES

17. Plaintiff is a resident and citizen of Detroit, Michigan.

18. Defendant Abbott is a corporation that maintains its principal place of business at 100 Abbott Park Road, Abbott Park, Illinois, 60064. Defendant Abbott's registered agent is CT Corporation System located at 208 S. LaSalle Street, Suite 814, Chicago, Illinois, 60604.

19. Defendant Exact Sciences is a corporation that maintains its principal place of business at 5505 Endeavor Lane, Madison, Wisconsin, 53719. Defendant Exact Sciences' registered agent is CT Corporation System located at 301 S. Bedford Street, Suite 1, Madison, Wisconsin, 53703. Defendant Exact Sciences is a wholly owned subsidiary of Defendant Abbott.

## III. JURISDICTION AND VENUE

20. This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1332(d)(2)(A), as modified by the Class Action Fairness Act of 2005 ("CAFA"), 28 U.S.C. §

1711, *et seq.*, because at least one member of the Class, as defined below, is a citizen of a different state than Defendants, there are more than 100 members of the Class, and the aggregate amount in controversy exceeds $5,000,000, exclusive of interest and costs.

21. This Court has general personal jurisdiction over Defendant Abbott because Abbott maintains its principal place of business in this District, has sufficient minimum contacts with this District, and has purposefully availed itself of the privilege of doing business in this District, such that it could reasonably foresee litigation being brought in this District.

22. This Court has personal jurisdiction over Defendant Exact Sciences because Exact Sciences is a wholly owned subsidiary of Abbott, the Data Breach was publicly disclosed through Abbott's corporate communications, the Illinois Attorney General notification was submitted by Abbott, the cybersecurity, information governance, incident response, legal, compliance, and privacy functions involved in responding to the Data Breach were operated from Illinois, and Plaintiff's claims arise directly from data security and breach response decisions made or coordinated in Illinois. Exact Sciences purposefully directed its activities toward Illinois through its integrated operation with Abbott, and the claims arise from those Illinois contacts. Furthermore Exact Sciences is registered to do business in Illinois.

23. Venue is proper in this District under 28 U.S.C. § 1391(a) through (d) because Abbott's principal place of business is located in this District and a substantial part of the events or omissions giving rise to the claims occurred in, was directed to, and/or emanated from this District.

## IV. STATEMENT OF FACTS

### A. Background on Defendants

24. Defendant Abbott is a multinational healthcare and medical device company headquartered in Abbott Park, Illinois.

25. Defendant Exact Sciences is an American molecular diagnostics company based in Madison, Wisconsin, specializing in the detection of early-stage cancers. Defendant Exact Sciences is owned by Defendant Abbott.

26. In order to obtain services from Defendants, Plaintiff and Class Members were required to provide Defendants, either directly or indirectly, with their sensitive and confidential Private Information.

27. The information held by Defendants in their computer systems at the time of the Data Breach included the unencrypted Private Information of Plaintiff and Class Members.

28. Upon information and belief, Defendants made promises and representations to Plaintiff and Class Members, that the Private Information collected from them would be kept safe and confidential, that the privacy of that information would be maintained, and that Defendants would delete any sensitive information after they were no longer required to maintain it.

29. Plaintiff and Class Members provided their Private Information to Defendants with the reasonable expectation and on the mutual understanding that Defendants would comply with their obligations to keep such information confidential and secure from unauthorized access.

30. Plaintiff and Class Members have taken reasonable steps to maintain the confidentiality of their Private Information. Plaintiff and Class Members relied on the sophistication of Defendants to keep their Private Information confidential and securely maintained, to use this information for necessary purposes only, and to make only authorized disclosures of this information. Plaintiff and Class Members value the confidentiality of their Private Information and demand security to safeguard their Private Information.

31. Defendants had a duty to adopt reasonable measures to protect the Private Information of Plaintiff and Class Members from involuntary disclosure to third parties.

Defendants have legal duties to keep Plaintiff's and Class Members' Private Information safe and confidential.

32. Defendants had obligations created by the FTC Act, HIPAA, contract, industry standards, and representations made to Plaintiff and Class Members, to keep their Private Information confidential and to protect it from unauthorized access and disclosure.

33. Defendants derived a substantial economic benefit from collecting and using Plaintiff's and Class Members' Private Information. Without the required submission of Private Information, Defendants could not provide their services to Plaintiff and Class Members.

34. By obtaining, collecting, using, and deriving a benefit from Plaintiff's and Class Members' Private Information, Defendants assumed legal and equitable duties and knew or should have known that they were responsible for protecting Plaintiff's and Class Members' Private Information from disclosure.

**B. The Data Breach**

35. Upon information and belief, on or around July 15, 2026, Defendants experienced a Data Breach. Since the Data Breach occurred, the notorious ransomware group "ShinyHunters" claimed responsibility for the Data Breach.[6]

36. ShinyHunters is a notorious black-hat cybercriminal group, believed to have formed in 2019.[7] ShinyHunters specializes in large-scale data breaches, extortion, and selling stolen user data on the dark web.[8]

---

[6] https://www.hookphish.com/blog/ransomware-group-shinyhunters-hits-abbott-owned-exact-sciences-corporation/ (last visited August 18, 2026).

[7] https://www.docontrol.io/blog/shinyhunters (last visited August 18, 2026).

[8] *Id.*

37. On July 16, 2026, Defendant Abbott published a statement on its website indicating it is "investigating a cyber incident.[9]

38. Defendants did not use reasonable security procedures and practices appropriate to the nature of the sensitive information they were maintaining for Plaintiff and Class Members, such as encrypting the information or deleting it when it is no longer needed.

39. Plaintiff's Private Information and that of Class Members was subsequently sold or otherwise made available on the dark web following the Data Breach, as is the *modus operandi* of cybercriminals that commit cyber-attacks of this type.

40. Indeed, ShinyHunters have posted the data of the Class Members to the dark web as confirmed by "Have I Been Pwned" including "e-mail addresses, physical addresses, phone numbers, dates of birth, genders, and personal health information belonging to customers, patients and healthcare providers."[10]

**C. Data Breaches are Preventable**

41. Defendants could have prevented this Data Breach by, among other things, properly encrypting or otherwise protecting their equipment and computer files containing Private Information.

42. As explained by the Federal Bureau of Investigation, "[p]revention is the most effective defense against ransomware and it is critical to take precautions for protection."[11]

---

[9] https://www.abbott.com/en-us/corpnewsroom/diagnostics-testing/abbott-statement-on-cyber-incident-in-cancer-diagnostics-business (last visited August 18, 2026).

[10] https://www.theregister.com/cyber-crime/2026/08/07/shinyhunters-called-cancer-diagnostics-biz-and-tricked-staffers-into-giving-them-access-now-theyve-dumped-109m-email-addresses/5284857 (last visited August 19, 2026).

[11] https://www.fbi.gov/file-repository/ransomware-prevention-and-response-for-cisos.pdf/view (last visited August 19, 2026).

43. To prevent and detect cyber-attacks, Defendants could and should have implemented, as recommended by the United States government, the following measures:

- Implement an awareness and training program. Because end users are targets, customers and individuals should be aware of the threat of ransomware and how it is delivered.

- Enable strong spam filters to prevent phishing emails from reaching the end users and authenticate inbound email using technologies like Sender Policy Framework (SPF), Domain Message Authentication Reporting and Conformance (DMARC), and DomainKeys Identified Mail (DKIM) to prevent email spoofing.

- Scan all incoming and outgoing emails to detect threats and filter executable files from reaching end users.

- Configure firewalls to block access to known malicious IP addresses.

- Patch operating systems, software, and firmware on devices. Consider using a centralized patch management system.

- Set anti-virus and anti-malware programs to conduct regular scans automatically.

- Manage the use of privileged accounts based on the principle of least privilege: no users should be assigned administrative access unless absolutely needed; and those with a need for administrator accounts should only use them when necessary.

- Configure access controls—including file, directory, and network share permissions—with least privilege in mind. If a user only needs to read specific files, the user should not have write access to those files, directories, or shares.

- Disable macro scripts from office files transmitted via email. Consider using Office Viewer software to open Microsoft Office files transmitted via email instead of full office suite applications.

- Implement Software Restriction Policies (SRP) or other controls to prevent programs from executing from common ransomware locations, such as temporary folders supporting popular Internet browsers or compression/decompression programs, including the AppData/LocalAppData folder.

- Consider disabling Remote Desktop protocol (RDP) if it is not being used.

- Use application whitelisting, which only allows systems to execute programs known and permitted by security policy.

- Execute operating system environments or specific programs in a virtualized environment.

- Categorize data based on organizational value and implement physical and logical separation of networks and data for different organizational units.[12]

44. To prevent and detect cyber-attacks or ransomware attacks, Defendants could and should have implemented, as recommended by the Microsoft Threat Protection Intelligence Team, the following measures:

- **Secure internet-facing assets**
    - Apply latest security updates
    - Use threat and vulnerability management
    - Perform regular audit; remove privileged credentials;
- **Thoroughly investigate and remediate alerts**
    - Prioritize and treat commodity malware infections as potential full compromise;
- **Include IT Pros in security discussions**
    - Ensure collaboration among [security operations], [security admins], and [information technology] admins to configure servers and other endpoints securely;
- **Build credential hygiene**
    - Use [multifactor authentication] or [network level authentication] and use strong, randomized, just-in-time local admin passwords;
- **Apply principle of least-privilege**
    - Monitor for adversarial activities Hunt for brute force attempts Monitor for cleanup of Event Logs Analyze logon events;
- **Harden infrastructure**
    - Use Windows Defender Firewall
    - Enable tamper protection
    - Enable cloud-delivered protection

[12] *Id* at 3-4.

- Turn on attack surface reduction rules and [Antimalware Scan Interface] for Office
- [Visual Basic for Applications][13]

45. Given that Defendants were storing the sensitive Private Information of Plaintiff and Class Members, Defendants could and should have implemented all of the above measures to prevent and detect cyberattacks.

46. The occurrence of the Data Breach indicates that Defendants failed to adequately implement one or more of the above measures to prevent cyberattacks, resulting in the Data Breach and the exposure of the Private Information of, upon information and belief, hundreds of thousands of individuals, including that of Plaintiff and Class Members.

**D. Defendants Acquire, Collect, and Store Private Information**

47. As a condition of receiving services, Plaintiff and Class Members were required to give their sensitive and confidential Private Information to Defendants.

48. Defendants retain and store this information and derive a substantial economic benefit from the Private Information that it collects. But for the collection of Plaintiff's and Class Members' Private Information, Defendants would be unable to provide their services.

49. By obtaining, collecting, and storing the Private Information of Plaintiff and Class Members, Defendants assumed legal and equitable duties and knew or should have known that they were responsible for protecting the Private Information from disclosure.

50. Plaintiff and Class Members have taken reasonable steps to maintain the confidentiality of their Private Information and relied on Defendants to keep their Private

---

[13] *See* https://www.microsoft.com/en-us/security/blog/2020/03/05/human-operated-ransomware-attacks-a-preventable-disaster/ (last visited August 19, 2026).

Information confidential and maintained securely, to use this information for business purposes only, and to make only authorized disclosures of this information.

51. Defendants could have prevented this Data Breach by properly securing and encrypting the files and file servers containing the Private Information of Plaintiff and Class Members.

**E. Defendants Knew or Should Have Known of the Risk Because Companies in Possession of Private Information are Susceptible to Cyber Attacks**

52. Data thieves regularly target companies like Defendants due to the highly sensitive information that they custody. Defendants knew and understood that unprotected Private Information is valuable and highly sought after by criminal parties who seek to illegally monetize that Private Information through unauthorized access.

53. Defendants' data security obligations were particularly important given the substantial increase in cyber-attacks and/or data breaches targeting entities that collect and store Private Information and other sensitive information, like Defendants, preceding the date of the breach.

54. In 2023, an all-time high for data compromises occurred, with 3,205 compromises affecting 353,027,892 total victims.[14]

55. The estimated number of organizations impacted by data compromises has increased by +2,600 percentage points since 2018, and the estimated number of victims has increased by +1400 percentage points. The 2023 compromises represent a 78 percentage point increase over the previous year and a 72 percentage point hike from the previous all-time high number of compromises (1,860) set in 2021.

[14] *See* 2023 Data Breach Annual Report, (https://www.idtheficenter.org/wp-content/uploads/2024/01/ITRC 2023).

56. In light of recent high profile data breaches at other industry leading companies, including 23andMe, Inc. (20 million records, October 2023), American Medical Collection Agency (25 million patients, March 2019), University of Washington Medicine (974,000 patients, December 2018), Florida Orthopedic Institute (640,000 patients, July 2020), Wolverine Solutions Group (600,000 patients, September 2018), Oregon Department of Human Services (645,000 patients, March 2019), Elite Emergency Physicians (550,000 patients, June 2020), Magellan Health (365,000 patients, April 2020), and BJC Health System (286,876 patients, March 2020), Defendants knew or should have known that the Private Information that they collected and maintained would be targeted by cybercriminals.

57. As a particularly salient example, in February 2024—eight months before the Data Breach began—a massive attack on Change Healthcare, a subsidiary of insurer UnitedHealth disrupted health care operations on an unprecedented national scale, endangering patients' access to care, disrupting critical clinical and eligibility operations, and threatening the solvency of the nation's provider network.

58. As a custodian of Private Information, Defendants knew, or should have known, the importance of safeguarding the Private Information entrusted to them by Plaintiff and Class Members, and of the foreseeable consequences if their data security systems were breached, including the significant costs imposed on Plaintiff and Class Members as a result of a breach.

59. Despite the prevalence of public announcements of data breach and data security compromises, Defendants failed to take appropriate steps to protect the Private Information of Plaintiff and Class Members from being compromised.

60. At all relevant times, Defendants knew, or reasonably should have known, of the importance of safeguarding the Private Information of Plaintiff and Class Members and of the

foreseeable consequences that would occur if Defendants data security system were breached, including, specifically, the significant costs that would be imposed on Plaintiff and Class Members as a result of a breach.

61. Defendants were, or should have been, fully aware of the unique type and the significant volume of data on Defendants server(s), amounting to many thousands of individuals detailed, Private Information, and, thus, the significant number of individuals who would be harmed by the exposure of the unencrypted data.

62. The injuries to Plaintiff and Class Members were directly and proximately caused by Defendants' failure to implement or maintain adequate data security measures for the Private Information of Plaintiff and Class Members.

63. The ramifications of Defendants' failure to keep secure the Private Information of Plaintiff and Class Members are long-lasting and severe. Once Private Information is stolen, fraudulent use of that information and damage to victims may continue for years.

64. As a company in possession of Private Information, Defendants knew, or should have known, the importance of safeguarding the Private Information entrusted to them by Plaintiff and Class Members and of the foreseeable consequences if their data security systems were breached. This includes the significant costs imposed on Plaintiff and Class Members as a result of a breach. Nevertheless, Defendants failed to take adequate cybersecurity measures to prevent the Data Breach.

**F. Value of Personally Identifying Information**

65. The Federal Trade Commission ("FTC") defines identity theft as "a fraud committed or attempted using the identifying information of another person without authority." The FTC describes "identifying information" as "any name or number that may be used, alone or in conjunction with any other information, to identify a specific person," including, among other

things, "[n]ame, Social Security number, date of birth, official State or government issued driver's license or identification number, alien registration number, government passport number, employee benefit management company or taxpayer identification number." 17 C.F.R. § 248.201 (2013).

66. The Private Information of individuals remains of high value to criminals, as evidenced by the prices they will pay through the dark web. Numerous sources cite dark web pricing for stolen identity credentials. *Id*. For example, personal information can be sold at a price ranging from $40 to $200.[15]

67. Based on the foregoing, the information compromised in the Data Breach is significantly more valuable than the loss of, for example, credit card information in a data breach because, there, victims can cancel or close credit and debit card accounts.

68. Aside from the risks of identity theft and fraud, personal information is also property that has monetary value to data breach victims.

69. In a consumer-driven world, the ability to capture and use customer data to shape products, solutions, and the buying experience is critically important to a business's success. Research shows that organizations who "leverage customer behavior insights outperform peers by 85 percent in sales growth and more than 25 percent in gross margin."[16]

70. In 2013, the Organization for Economic Cooperation and Development ("OECD") published a paper entitled "Exploring the Economics of Personal Data: A Survey of Methodologies

[15] https://www.digitaltrends.com/computing/personal-data-sold-on-the-dark-web-how-much-it-costs/ (last visited August 19, 2026).

[16] Brad Brown et al., *Capturing value from your customer data*, McKinsey (Mar. 15, 2017), https://www.mckinsey.com/capabilities/quantumblack/our-insights/capturing-value-from-your-customer-data.

for Measuring Monetary Value."[17] In this paper, the OECD measured prices demanded by companies concerning user data derived from "various online data warehouses."[18]

71. OECD indicated that "[a]t the time of writing, the following elements of personal data were available for various prices: USD 0.50 cents for an address, USD 2 [$2] for a date of birth, USD 8 [$8] for a Social Security number (government ID number), USD 3 [$3] for a driver's license number and USD 35 [$35] for a military record. A combination of address, date of birth, Social Security number, credit record and military [record] is estimated to cost USD 55 [$55]."[19]

72. This economic value has been leveraged largely by corporations who pioneered the methods of its extraction, analysis, and use. However, the data also has economic value to users. Market exchanges have sprung up where individual users like Plaintiff can sell or monetize their own data. For example, Nielsen Data and Mobile Computer will pay users for their data.[20] Likewise, apps such as Zynn, a TikTok competitor, pay users to sign up and interact with the app.[21]

73. There are numerous examples of this kind of market, which is growing more robust as information asymmetries are diminished when users discover how their data is being covertly intercepted, collected, used, and disclosed.

---

[17] *Exploring the Economics of Personal Data: A Survey of Methodologies for Measuring Monetary Value*, OECD Digital Economy Papers, No. 220 (Apr. 2, 2013), https://www.oecdilibrary.org/docserver/5k486qtxldmq-en.pdf.

[18] *Id.* at 25.

[19] *Id.*

[20] Kevin Mercandante, *Ten Apps for Selling Your Data for Cash, Best Wallet Hacks* (June 10, 2020), https://wallethacks.com/apps-for-selling-your-data/.

[21] Jacob Kastrenakes, *A new TikTok Clone hit the top of the App Store by paying users to watch videos*, The Verge (May 29, 2020), https://www.theverge.com/2020/5/29/21274994/zynn-tiktokclone-pay-watch-videos-kuaishou-bytedance-rival.

74. As a group of information technology professors relayed in a 2016 article entitled "The Economics of Privacy," published in the Journal of Economic Literature:

> Such vast amounts of collected data have obvious and substantial economic value. Individuals' traits and attributes (such as a person's age, address, gender, income, and consumption habits) are increasingly regarded as business assets that can be used to target services or offers, provide relevant advertising, or be traded with other parties.[22]

75. In other words, a successful cyberattack leaves criminals with a lucrative and readily monetized supply of Private Information—and deprives its victims of the exclusive use of their own information.

76. The documented increase in cyberattacks, combined with increasing monetary incentives that heighten the risk of future attacks, was widely known to the public and to anyone in the healthcare industry, including Defendants, at the time of the Data Breach.

77. Among other forms of fraud, identity thieves may obtain driver's licenses, government benefits, medical services, and housing or even give false information to police.

78. The fraudulent activity resulting from the Data Breach may not come to light for years. There may be a time lag between when harm occurs versus when it is discovered, and also between when Private Information is stolen and when it is used. According to the U.S. Government Accountability Office ("GAO"), which conducted a study regarding data breaches:

> [L]aw enforcement officials told us that in some cases, stolen data may be held for up to a year or more before being used to commit identity theft. Further, once stolen data have been sold or posted on the Web, fraudulent use of that information may continue for years. As a result, studies that attempt to measure the harm resulting from data breaches cannot necessarily rule out all future harm[23]

---

[22] Alessandro Acquisti et al., *The Economics of Privacy*, 54 J. of Econ. Lit. 442, 444 (June 2016).
[23] Report to Congressional Requesters, GAO, at 29 (June 2007), available at: https://www.gao.gov/assets/gao-07-737.pdf

79. Plaintiff and Class Members now face years of constant surveillance of their medical, financial, and personal records, monitoring, and loss of rights. The Class is incurring and will continue to incur such damages in addition to any fraudulent use of their Private Information.

**G. Defendants Fail to Comply with FTC Guidelines**

80. Federal and State governments have likewise established security standards and issued recommendations to diminish data breaches and the resulting harm to consumers and financial institutions. For example, Defendants are prohibited by the FTC Act from engaging in "unfair or deceptive acts or practices in or affecting commerce." The FTC has concluded that a company's failure to maintain reasonable and appropriate data security for consumers' sensitive personal information is an "unfair practice" in violation of the FTC Act.

81. The FTC has issued numerous guides for business outlining reasonable data and cyber security practices. According to the FTC, the need for data and cyber security should be factored into all business decision-making.[24]

82. In 2016, the FTC updated its publication, *Protecting Personal Information: A Guide for Business*, which established guidelines for fundamental data and cyber security principles and practices for business.[25] The guidelines note businesses should, among other best practices:

a. Protect the personal customer and consumer information that they keep;

b. Properly dispose of personal information that is no longer needed;

---

[24] *Start with Security: A Guide for Business* at 2, FTC (June 2015), https://www.ftc.gov/system/files/documents/plain-language/pdf0205-startwithsecurity.pdf.

[25] *Protecting Personal Information: A Guide for Business*, FTC (Oct. 2016), https://www.ftc.gov/tips-advice/business-center/guidance/protecting-personal-information-guide-business; https://www.ftc.gov/business-guidance/resources/protecting-personal-information-guide-business

c. Encrypt information stored on computer networks;

d. Understand their network's vulnerabilities; and

e. Implement policies to correct security problems.[26]

83. The guidelines further recommend that businesses implement an array of specific methods to protect their systems, such as:

a. Using an intrusion detection system to expose a breach as soon as it occurs;

b. Monitoring all incoming traffic for activity indicating someone is attempting to hack the system;

c. Watching for large amounts of data being transmitted from the system; and

d. Having a response plan ready in the event of a breach.[27]

84. The FTC also recommends that companies limit access to sensitive data; require complex passwords to be used on networks; use industry-tested methods for security; monitor for suspicious activity on the network; and verify that third-party service providers have implemented reasonable security measures.

85. The FTC has brought enforcement actions against businesses for failing to adequately and reasonably protect customer and consumer data, treating the failure to employ reasonable and appropriate measures to protect against unauthorized access to confidential consumer data as an unfair act or practice prohibited by Section 5 of the FTC Act, 15 U.S.C. § 45. Orders resulting from these actions further clarify the measures businesses must take to meet their data and cyber security obligations. Indeed, in 2024, the FTC brought an enforcement action

[26] *See id.*

[27] *Id.*

against telecommunications provider Global Tel*Link Corporation for failing to secure the sensitive data of hundreds of thousands of individuals.[28]

86. Further, the National Institute of Standards in Technology ("NIST") publishes substantive recommendations and procedural guidance pertaining to a broad set of cybersecurity topics including risk assessments, risk management strategies, access controls, training, data security controls, network monitoring, breach detection, and incident response.[29] Defendants failed to adhere to the NIST guidance.

87. For example, NIST recommends application whitelisting, which is a security practice that allows only pre-approved and trusted applications to run on a system, blocking any unauthorized or unknown software from executing.[30] This proactive approach is designed to prevent malware, ransomware, and unauthorized software from compromising systems.

88. NIST also emphasizes the "principle of least privilege."[31] This concept includes limiting access to customer data to only relevant staff, usually specific users with specific privileges, is part of the fundamental cybersecurity concept of least privileges, which dictates that users, applications, systems, or processes should be granted only the minimum levels of access

---

[28] *FTC Finalizes Order with Global Tel*Link Over Security Failures that Led to Breach of Sensitive Data*, Federal Trade Comm'n (Feb. 23, 2024), https://www.ftc.gov/news-events/news/press-releases/2024/02/ftc-finalizes-order-global-tellink-over-security-failures-led-breach-sensitive-data.

[29] *Protecting Personal Information: A Guide for Business*; *see generally Security and Privacy Controls for Information Systems and Organizations*, https://nvlpubs.nist.gov/nistpubs/SpecialPublications/NIST.SP.800-53r5.pdf (last visited August 20, 2026).

[30] *NIST 800-167*, https://nvlpubs.nist.gov/nistpubs/specialpublications/nist.sp.800-167.pdf (last visited August 20, 2026).

[31] *NIST-SP 800-53*, https://csrc.nist.gov/CSRC/media/Projects/risk-management/800-53%20Downloads/800-53r5/SP_800-53_v5_1-derived-OSCAL.pdf (last visited August 20, 2026).

necessary to perform their specific tasks. By limiting access rights, organizations can reduce the potential attack surface, mitigate the risk of accidental or intentional misuse of privileges, and enhance their overall system security.

89. Furthermore, NIST recommends terminating sessions in order to ensure maximum efficacy for a newly-installed patch to a vulnerability.[32] This technique ends all active sessions and prevents the attacker form accessing any further information.[33]

90. NIST also recommends the expiration of sessions and periodic re-authentication, suggesting that sessions should be terminated after a period of inactivity (like 15-30 minutes) and users should re-authenticate at least every 12 hours.[34]

**H. Defendants Fail to Comply with HIPAA Guidelines**

91. Defendants are covered entities under HIPAA (45 C.F.R. § 160.102) and are required to comply with the HIPAA Privacy Rule and Security Rule, 45 C.F.R. Part 160 and Part 164, Subparts A and E ("Standards for Privacy of Individually Identifiable Health Information"), and Security Rule ("Security Standards for the Protection of Electronic Protected Health Information"), 45 C.F.R. Part 160 and Part 164, Subparts A and C.

92. Defendants are subject to the rules and regulations for safeguarding electronic forms of medical information pursuant to the Health Information Technology Act ("HITECH").[35]

---

[32] *NIST-SP 800-53 (Technique AC-12)*, https://csrc.nist.gov/CSRC/media/Projects/risk-management/800-53%20Downloads/800-53r5/SP_800-53_v5_1-derived-OSCAL.pdf (last visited August 20, 2026).

[33] Akshat Choudhary, *Session Hijacking 101: What It Is, How It Works, and How to Stop It* (last visited August 20, 2026), https://www.malcare.com/blog/session-hijacking/.

[34] *NIST-SP 800-63B*, https://pages.nist.gov/800-63-4/sp800-63b.html (last visited August 20, 2026).

[35] HIPAA and HITECH work in tandem to provide guidelines and rules for maintaining protected health information. HITECH references and incorporates HIPAA.

93. HIPAA's Privacy Rule or *Standards for Privacy of Individually Identifiable Health Information* establishes national standards for the protection of health information.

94. HIPAA's Privacy Rule or *Security Standards for the Protection of Electronic Protected Health Information* establishes a national set of security standards for protecting health information that is kept or transferred in electronic form.

95. HIPAA requires "compl[iance] with the applicable standards, implementation specifications, and requirements" of HIPAA "with respect to electronic protected health information." 45 C.F.R. § 164.302.

96. "Electronic protected health information" is "individually identifiable health information … that is (i) transmitted by electronic media; maintained in electronic media." 45 C.F.R. § 160.103.

97. HIPAA's Security Rule requires Defendants to do the following:

a. Ensure the confidentiality, integrity, and availability of all electronic protected health information the covered entity or business associate creates, receives, maintains, or transmits;

b. Protect against any reasonably anticipated threats or hazards to the security or integrity of such information;

c. Protect against any reasonably anticipated uses or disclosures of such information that are not permitted; and

d. Ensure compliance by its workforce.

98. HIPAA also requires Defendants to "review and modify the security measures implemented … as needed to continue provision of reasonable and appropriate protection of electronic protected health information." 45 C.F.R. § 164.306(e).

99. Additionally, Defendants are required under HIPAA to "[i]mplement technical policies and procedures for electronic information systems that maintain electronic protected health information to allow access only to those persons or software programs that have been granted access rights." 45 C.F.R. § 164.312(a)(1).

100. HIPAA and HITECH also obligated Defendants to implement policies and procedures to prevent, detect, contain, and correct security violations, and to protect against uses or disclosures of electronic protected health information that are reasonably anticipated but not permitted by the privacy rules. *See* 45 C.F.R. § 164.306(a)(1) and § 164.306(a)(3); *see also* 42 U.S.C. §17932.

101. HIPAA requires a covered entity to have and apply appropriate sanctions against members of its workforce who fail to comply with the privacy policies and procedures of the covered entity or the requirements of 45 C.F.R. Part 164, Subparts D or E. *See* 45 C.F.R. § 164.530(e).

102. HIPAA requires a covered entity to mitigate, to the extent practicable, any harmful effect that is known to the covered entity of a use or disclosure of protected health information in violation of its policies and procedures or the requirements of 45 C.F.R. Part 164, Subpart E by the covered entity or its business associate. *See* 45 C.F.R. § 164.530(f).

103. HIPAA also requires the Office of Civil Rights ("OCR"), within the Department of Health and Human Services ("HHS"), to issue annual guidance documents on the provisions in the HIPAA Security Rule. *See* 45 C.F.R. §§ 164.302-164.318. For example, "HHS has developed

guidance and tools to assist HIPAA covered entities in identifying and implementing the most cost effective and appropriate administrative, physical, and technical safeguards to protect the confidentiality, integrity, and availability of e-PHI and comply with the risk analysis requirements of the Security Rule." US Department of Health & Human Services, Security Rule Guidance Material.[36] The list of resources includes a link to guidelines set by the National Institute of Standards and Technology (NIST), which OCR says "represent the industry standard for good business practices with respect to standards for securing e-PHI." US Department of Health & Human Services, Guidance on Risk Analysis.[37]

**I. Defendants Failed to Comply with Industry Standards**

104. As noted above, experts studying cyber security routinely identify companies in possession of Private Information as being particularly vulnerable to cyberattacks because of the value of the Private Information which they collect and maintain.

105. Several best practices have been identified that, at a minimum, should be implemented by companies in possession of Private Information, like Defendants, including but not limited to: educating all employees; strong passwords; multi-layer security, including firewalls, anti-virus, and anti-malware software; encryption, making data unreadable without a key; multi-factor authentication; backup data and limiting which employees can access sensitive data. Defendants failed to follow these industry best practices, including a failure to implement multi-factor authentication.

---

[36] https://www.hhs.gov/hipaa/for-professionals/security/guidance/index.html (last visited August 19, 2026).

[37] https://www.hhs.gov/hipaa/for-professionals/security/guidance/guidance-risk-analysis/index.html (last visited August 19, 2026).

106. Other best cybersecurity practices that are standard in the industry include installing appropriate malware detection software; monitoring and limiting the network ports; protecting web browsers and email management systems; setting up network systems such as firewalls, switches and routers; monitoring and protection of physical security systems; protection against any possible communication system; training staff regarding critical points. Defendants failed to follow these cybersecurity best practices, including failure to train staff.

107. Defendants failed to meet the minimum standards of the following frameworks: the NIST Cybersecurity Framework Version 2.0 (including without limitation PR.AA-01, PR.AA.-02, PR.AA-03, PR.AA-04, PR.AA-05, PR.AT-01, PR.DS-01, PR-DS-02, PR.DS-10, PR.PS-01, PR.PS-02, PR.PS-05, PR.IR-01, DE.CM-01, DE.CM-03, DE.CM-06, DE.CM-09, and RS.CO-04), and the Center for Internet Security's Critical Security Controls (CIS CSC), which are all established standards in reasonable cybersecurity readiness.

108. These foregoing frameworks are existing and applicable industry standards in the industry safeguarding their employees and customers' data, and upon information and belief, Defendants failed to comply with at least one—or all—of these accepted standards, thereby opening the door to the threat actor and causing the Data Breach.

**J. Common Injuries and Damages**

109. As a result of Defendants ineffective and inadequate data security practices, the Data Breach, and the foreseeable consequences of Private Information ending up in the possession of criminals, the risk of identity theft to the Plaintiff and Class Members has materialized and is imminent, and Plaintiff and Class Members have all sustained actual injuries and damages, including: (i) invasion of privacy; (ii) theft of their Private Information; (iii) lost or diminished value of Private Information, and lost value of the unauthorized access to Private Information permitted by Defendants; (iv) lost time associated with attempting to mitigate the actual

consequences of the Data Breach; (v) loss of benefit of the bargain; (vi) lost opportunity costs associated with attempting to mitigate the actual consequences of the Data Breach; (vii) the present value of ongoing identity protection services necessitated by the Data Breach; (viii) nominal damages; and (ix) the continued and certainly increased risk to their Private Information, which: (a) remains unencrypted and available for unauthorized third parties to access and abuse; and (b) remains backed up in Defendants possession and is subject to further unauthorized disclosures so long as Defendants fail to undertake appropriate and adequate measures to protect the Private Information.

**K. The Data Breach Increases Victims' Risk of Identity Theft**

110. Because of Defendants' actions as detailed herein, the unencrypted Private Information of Plaintiff and Class Members has been published on the dark web.

111. Unencrypted Private Information may also fall into the hands of companies that will use the detailed Private Information for targeted marketing without the approval of Plaintiff and Class Members. Simply put, unauthorized individuals can easily access the Private Information of Plaintiff and Class Members.

112. The link between a data breach and the risk of identity theft is simple and well established. Criminals acquire and steal Private Information to monetize the information. Criminals monetize the data by selling the stolen information on the black market to other criminals who then utilize the information to commit a variety of identity theft related crimes discussed below.

113. Plaintiff's and Class Members' Private Information is of great value to hackers and cyber criminals, and the data stolen in the Data Breach has been used and will continue to be used in a variety of sordid ways for criminals to exploit Plaintiff and Class Members and to profit off their misfortune.

114. Even if cybercriminals do not gain access to a complete set of an individual's PII during a data breach, cybercriminals can cross-reference two or more sources of PII to marry data available elsewhere with criminally stolen data, resulting in complete and accurate dossiers on individuals. These dossiers are known as "Fullz" packages.

115. The development of "Fullz" packages means stolen PII from a data breach can easily be linked to victims' phone numbers, email addresses, and other unregulated sources and identifiers. In other words, even if certain information such as emails, phone numbers, or credit card numbers is not included in the Private Information stolen in a specific incident, criminals can easily create a "Fullz" package that links that information together and sell the package at a higher price.

116. Importantly, once a cybercriminal has a "Fullz" package, cybercriminals can use it to commit a host of criminal acts including: credit card fraud, loan fraud, identity fraud, account take overs, medical identity fraud, tax refund fraud, and buy now pay later frauds.[38] Most problematic, however, is that cybercriminals in possession of a "Fullz" package "are difficult to stop with ordinary online security and ID verification measures because they possess all the information needed to get past typical authentication measures."[39]

**L. Loss of Time to Mitigate the Risk of Identity Theft and Fraud**

117. As a result of the recognized risk of identity theft, when a Data Breach occurs, and an individual is notified by a company that their Private Information was compromised, as in this Data Breach, the reasonable person is expected to take steps and spend time to address the

[38] Paige Tester, *What Are Fullz? How Hackers and Fraudsters Obtain and Use Fullz*, DataDome (last visited August 20, 2026), https://datadome.co/guides/account-takeover/what-are-fullz-how-do-fullz-work.

[39] *Protection Against Fullz and Fraud, Integrity*, Aristotle (Apr. 18, 2022), https://integrity.aristotle.com/2022/04/protection-against-fullz-and-fraud/.

dangerous situation, learn about the breach, and otherwise mitigate the risk of becoming a victim of identity theft or fraud. Failure to spend time taking steps to review accounts or credit reports could expose the individual to greater financial harm — yet the resource and asset of time has been lost.

118. Plaintiff and Class Members have spent, and will spend additional time in the future, on a variety of prudent actions, such as researching and verifying the legitimacy of the Data Breach, freezing their payment cards, contacting credit bureaus to place freezes on their accounts, and monitoring their financial accounts for any indication of fraudulent activity, which may take years to detect. Accordingly, the Data Breach has caused Plaintiff and Class Members to suffer actual injury in the form of lost time—which cannot be recaptured—spent on mitigation activities.

119. Plaintiff's mitigation efforts are consistent with the U.S. Government Accountability Office, which released a report in 2007 regarding data breaches ("GAO Report") in which it noted that victims of identity theft will face "substantial costs and time to repair the damage to their good name and credit record."[40]

120. Plaintiff's mitigation efforts are also consistent with the steps that FTC recommends that data breach victims take several steps to protect their personal and financial information after a data breach, including: contacting one of the credit bureaus to place a fraud alert (consider an extended fraud alert that lasts for seven years if someone steals their identity), reviewing their credit reports, contacting companies to remove fraudulent charges from their accounts, placing a credit freeze on their credit, and correcting their credit reports.

---

[40] *See* United States Government Accountability Office, GAO-07-737, Personal Information: Data Breaches Are Frequent, but Evidence of Resulting Identity Theft Is Limited; However, the Full Extent Is Unknown (June 2007), https://www.gao.gov/new.items/d07737.pdf

121. And for those Class Members who experience actual identity theft and fraud, the GAO Report notes that victims of identity theft will face "substantial costs and time to repair the damage to their good name and credit record."

**M. Value of Private Information**

122. Private Information is a valuable property right.[41] Its value is axiomatic, considering the value of Big Data in corporate America and the consequences of cyber thefts include heavy prison sentences. Even this obvious risk to reward analysis illustrates beyond doubt that Private Information has considerable market value.

123. Sensitive Private Information can sell for as much as $363 per record according to the Infosec Institute.[42]

124. An active and robust legitimate marketplace for Private Information also exists. In 2019, the data brokering industry was worth roughly $200 billion. In fact, the data marketplace is so sophisticated that consumers can actually sell their non-public information directly to a data broker who in turn aggregates the information and provides it to marketers or app developers.

125. As a result of the Data Breach, Plaintiff's and Class Members' Private Information, which has an inherent market value in both legitimate and illegitimate markets, has been damaged and diminished by its compromise and unauthorized release. However, this transfer of value occurred without any consideration paid to Plaintiff or Class Members for access to or use of their

---

[41] *See* United States Government Accountability Office, GAO-07-737, Personal Information: Data Breaches Are Frequent, but Evidence of Resulting Identity Theft Is Limited; However, the Full Extent Is Unknown (June 2007), https://www.gao.gov/new.items/d07737.pdf

[42] *See* "Data Breaches Are Frequent, but Evidence of Resulting Identity Theft Is Limited; However, the Full Extent Is Unknown," p. 2, U.S. Government Accountability Office, June 2007, https://www.gao.gov/new.items/d07737.pdf

property, resulting in an economic loss. Moreover, the Private Information is now readily available, and the rarity of the Data has been lost, thereby causing additional loss of value.

126. At all relevant times, Defendants knew, or reasonably should have known, of the importance of safeguarding the Private Information of Plaintiff and Class Members, and of the foreseeable consequences that would occur if Defendants data security system were breached, including, specifically, the significant costs that would be imposed on Plaintiff and Class Members as a result of a breach.

127. The fraudulent activity resulting from the Data Breach may not come to light for years.

128. Plaintiff and Class Members now face years of constant surveillance of their financial and personal records, monitoring, and loss of rights. The Class is incurring and will continue to incur such damages in addition to any fraudulent use of their Private Information.

129. Defendants were, or should have been, fully aware of the unique type and the significant volume of data on Defendants network, amounting to many thousands of individuals Private Information and, thus, the significant number of individuals who would be harmed by the exposure of the unencrypted data.

**N. Future Costs of Credit and Identity Theft Monitoring is Reasonable and Necessary**

130. Stolen Private information has been placed, or will be placed, on the black market/dark web and used by criminals seeking to commit identity-related crimes, e.g., opening bank accounts in the victims' names to make purchases or to launder money; file false tax returns; take out loans or lines of credit; or file false medical or unemployment claims.

131. Such fraud may go undetected until debt collection calls commence months, or even years, later. An individual may not know that his or her Private Information was used to file for

unemployment benefits until law enforcement notifies the individual's employee-benefit management company of the suspected fraud. Fraudulent tax returns are typically discovered only when an individual's authentic tax return is rejected.

132. Consequently, Plaintiff and Class Members are at an increased risk of fraud and identity theft for many years into the future.

133. The retail cost of identity theft protection can exceed $200 a year per Class Member. This is a reasonable and necessary cost to monitor to protect Class Members from the risk of identity theft and fraud arising from Defendants' Data Breach.

**O. Loss of Benefit of the Bargain**

134. Furthermore, Defendants poor data security deprived Plaintiff and Class Members of the benefit of their bargain. When agreeing to obtain goods and/or services from Defendants under certain terms, Plaintiff and other reasonable individuals understood and expected that Defendants would properly safeguard and protect their Private Information, when in fact, Defendants did not provide the expected data security. Accordingly, Plaintiff and Class Members received services of a lesser value than what they reasonably expected to receive under the bargains they struck with Defendants.

**P. Plaintiff's Experience**

135. Plaintiff is a customer of Defendants.

136. Defendants obtained and stored Plaintiff's Private Information in their ordinary course of business practices.

137. Defendants were in possession of Plaintiff's Private Information before, during, and after the Data Breach.

138. Plaintiff reasonably understood and expected that Defendants would safeguard his Private Information and timely and adequately notify him in the event of a data breach. Plaintiff

would not have allowed Defendants, or anyone in Defendants' position, to maintain his Private Information if he believed that Defendants would fail to implement reasonable and industry standard practices to safeguard that information from unauthorized access.

139. Plaintiff greatly values his privacy and Private Information and takes reasonable steps to maintain the confidentiality of his Private Information. Plaintiff is very concerned about identity theft and fraud, as well as the consequences of such identity theft and fraud resulting from the Data Breach.

140. Plaintiff stores any and all documents containing his Private Information in a secure location and destroys any documents he receives in the mail that contain any Private Information or that may contain any information that could otherwise be used to compromise his identity. Moreover, Plaintiff diligently chooses unique usernames and passwords for his various online accounts.

141. As a consequence of and following the Data Breach, Plaintiff has experienced an increase in spam calls, text messages, and emails, evidencing misuse of his Private Information.

142. The Data Breach has caused Plaintiff to suffer fear, anxiety, and stress.

143. Plaintiff anticipates spending considerable time and money on an ongoing basis to try to mitigate and address harms caused by the Data Breach. In addition, Plaintiff will continue to be at present and continued increased risk of identity theft and fraud for years to come.

144. Plaintiff has a continuing interest in ensuring that his Private Information, which upon information and belief, remains in Defendants' possession, is protected and safeguarded from future breaches.

145. As a direct and traceable result of the Data Breach, Plaintiff suffered actual injury and damages after his Private Information was compromised and stolen in the Data Breach,

including, but not limited to: (a) lost time and money related to monitoring his accounts and credit reports for fraudulent activity; (b) loss of privacy due to his Private Information being accessed and stolen by cybercriminals; (c) loss of the benefit of the bargain because Defendants did not adequately protect his Private Information; (d) emotional distress because identity thieves now possess his Private Information; (e) imminent and impending injury arising from the increased risk of fraud and identity theft now that his Private Information has been stolen and published on the dark web; (f) diminution in the value of his Private Information, a form of intangible property that Defendants obtained from Plaintiff; (g) loss of the value of access to his Private Information permitted by Defendants; and (f) other economic and non-economic harm.

## CLASS ACTION ALLEGATIONS

146. Plaintiff brings this nationwide class action on behalf of himself, and on behalf of all others similarly situated pursuant to Rule 23(b)(2), 23(b)(3), and 23(c)(4) of the Federal Rules of Civil Procedure.

147. The Class that Plaintiff seeks to represent is defined as follows:

> Nationwide Class: All natural persons residing in the United States whose Private Information was accessed and/or acquired by an unauthorized party as a result of the Data Breach (the “Nationwide Class”).
>
> Illinois Subclass: All natural persons residing in Illinois whose Private Information was accessed and/or acquired by an unauthorized party as a result of the Data Breach (the “Illinois Subclass”).
>
> Michigan Subclass: All natural persons residing in Michigan whose Private Information was accessed and/or acquired by an unauthorized party as a result of the Data Breach (the “Michigan Subclass”).

148. Excluded from the Class are the following individuals and/or entities: Defendants and Defendants’ parents, subsidiaries, affiliates, officers and directors, and any entity in which Defendants have a controlling interest; all individuals who make a timely election to be excluded

from this proceeding using the correct protocol for opting out; and all judges assigned to hear any aspect of this litigation, as well as their immediate family members.

149. Plaintiff reserves the right to amend the definitions of the Class or Subclass or add a Class or Subclass if further information and discovery indicate that the definitions of the Class should be narrowed, expanded, or otherwise modified.

150. The proposed Class meets the criteria for certification under Fed. R. Civ. P. 23(a), (b)(2), and (b)(3).

151. Numerosity: The members of the Class are so numerous that joinder of all members is impracticable, if not completely impossible. Although the precise number of individuals is currently unknown to Plaintiff and exclusively in the possession of Defendants, upon information and belief, at least many thousands of individuals were impacted. The Class is identifiable within Defendants records.

152. Common questions of law and fact exist as to all members of the Class and predominate over any questions affecting solely individual members of the Class. Among the questions of law and fact common to the Class that predominate over questions which may affect individual Class members, including the following:

a. Whether and to what extent Defendants had a duty to protect the Private Information of Plaintiff and Class Members;

b. Whether Defendants had respective duties not to disclose the Private Information of Plaintiff and Class Members to unauthorized third parties;

c. Whether Defendants had respective duties not to use the Private Information of Plaintiff and Class Members for non-business purposes;

d. Whether Defendants failed to adequately safeguard the Private Information of Plaintiff and Class Members;

e. Whether and when Defendants actually learned of the Data Breach;

f. Whether Defendants adequately, promptly, and accurately informed Plaintiff and Class Members that their Private Information had been compromised;

g. Whether Defendants violated the law by failing to promptly notify Plaintiff and Class Members that their Private Information had been compromised;

h. Whether Defendants failed to implement and maintain reasonable security procedures and practices appropriate to the nature and scope of the information compromised in the Data Breach;

i. Whether Defendants adequately addressed and fixed the vulnerabilities which permitted the Data Breach to occur;

j. Whether Plaintiff and Class Members are entitled to actual damages and/or nominal damages as a result of Defendants wrongful conduct; and,

k. Whether Plaintiff and Class Members are entitled to injunctive relief to redress the imminent and currently ongoing harm faced as a result of the Data Breach.

153. Typicality: Plaintiff's claims are typical of those of the other members of the Class because Plaintiff, like every other Class Member, was exposed to virtually identical conduct and now suffers from the same violations of the law as each other member of the Class.

154. Policies Generally Applicable to the Class: This class action is also appropriate for certification because Defendants acted or refused to act on grounds generally applicable to the

Class, thereby requiring the Court's imposition of uniform relief to ensure compatible standards of conduct toward the Class Members and making final injunctive relief appropriate with respect to the Class as a whole. Defendants policies challenged herein apply to and affect Class Members uniformly and Plaintiff's challenge of these policies hinges on Defendants' conduct with respect to the Class as a whole, not on facts or law applicable only to Plaintiff.

155. Adequacy: Plaintiff will fairly and adequately represent and protect the interests of the Class Members in that he has no disabling conflicts of interest that would be antagonistic to those of the other Class Members. Plaintiff seeks no relief that is antagonistic or adverse to the Class Members and the infringement of the rights and the damages he has suffered is typical of other Class Members. Plaintiff has retained counsel experienced in complex class action and data breach litigation, and Plaintiff intends to prosecute this action vigorously.

156. Superiority and Manageability: The class litigation is an appropriate method for fair and efficient adjudication of the claims involved. Class action treatment is superior to all other available methods for the fair and efficient adjudication of the controversy alleged herein; it will permit a large number of Class Members to prosecute their common claims in a single forum simultaneously, efficiently, and without the unnecessary duplication of evidence, effort, and expense that hundreds of individual actions would require. Class action treatment will permit the adjudication of relatively modest claims by certain Class Members, who could not individually afford to litigate a complex claim against large companies, like Defendants. Further, even for those Class Members who could afford to litigate such a claim, it would still be economically impractical and impose a burden on the courts.

157. The nature of this action and the nature of laws available to Plaintiff and Class Members make the use of the class action device a particularly efficient and appropriate procedure

to afford relief to Plaintiff and Class Members for the wrongs alleged because Defendants would necessarily gain an unconscionable advantage since they would be able to exploit and overwhelm the limited resources of each individual Class Member with superior financial and legal resources; the costs of individual suits could unreasonably consume the amounts that would be recovered; proof of a common course of conduct to which Plaintiff was exposed is representative of that experienced by the Class and will establish the right of each Class Member to recover on the cause of action alleged; and individual actions would create a risk of inconsistent results and would be unnecessary and duplicative of this litigation.

158. The litigation of the claims brought herein is manageable. Defendants uniform conduct, the consistent provisions of the relevant laws, and the ascertainable identities of Class Members demonstrates that there would be no significant manageability problems with prosecuting this lawsuit as a class action.

159. Adequate notice can be given to Class Members directly using information maintained in Defendants records.

160. Unless a Class-wide injunction is issued, Defendants may continue in their failure to properly secure the Private Information of Class Members and Defendants may continue to act unlawfully as set forth in this Complaint.

161. Further, Defendants have acted on grounds that apply generally to the Class as a whole, so that class certification, injunctive relief, and corresponding declaratory relief are appropriate on a class- wide basis.

162. Likewise, particular issues under Rule 23(c) are appropriate for certification because such claims present only particular, common issues, the resolution of which would

advance the disposition of this matter and the parties' interests therein. Such particular issues include, but are not limited to:

a. Whether Defendants failed to timely notify the Plaintiff and the class of the Data Breach;

b. Whether Defendants owed a legal duty to Plaintiff and the Class to exercise due care in collecting, storing, and safeguarding their Private Information;

c. Whether Defendants' security measures to protect their data systems were reasonable in light of best practices recommended by data security experts;

d. Whether Defendants' failure to institute adequate protective security measures amounted to negligence;

e. Whether Defendants failed to take commercially reasonable steps to safeguard individuals Private Information; and,

f. Whether adherence to FTC data security recommendations, HIPAA requirements, and other measures recommended by data security experts would have reasonably prevented the Data Breach.

**CAUSES OF ACTION**
**COUNT I**
**Negligence**
**(On Behalf of Plaintiff and the Class against Defendants)**

163. Plaintiff realleges and incorporates by reference paragraphs 1 through 162 as if fully set forth herein.

164. Defendants require individuals, including Plaintiff and Class Members, to submit non-public Private Information in the ordinary course of providing their services.

165. Defendants gathered and stored the Private Information of Plaintiff and Class Members as part of their ordinary course of business.

166. Plaintiff and Class Members entrusted Defendants with their Private Information with the understanding that Defendants would safeguard their information.

167. Defendants had full knowledge of the sensitivity of the Private Information and the types of harm that Plaintiff and Class Members could and would suffer if the Private Information were wrongfully disclosed.

168. By assuming the responsibility to collect and store this data, and in fact doing so, and sharing it and using it for commercial gain, Defendants had a duty of care to use reasonable means to secure and to prevent disclosure of the information, and to safeguard the information from theft.

169. Defendants had a duty to employ reasonable security measures under Section 5 of the Federal Trade Commission Act, 15 U.S.C. § 45, which prohibits "unfair . . . practices in or affecting commerce," including, as interpreted and enforced by the FTC, the unfair practice of failing to use reasonable measures to protect confidential data.

170. Defendants owed a duty of care to Plaintiff and Class Members to provide data security consistent with industry standards and other requirements discussed herein, and to ensure that their systems and networks, and the personnel responsible for them, adequately protected the Private Information.

171. Defendants' duty of care to use reasonable security measures arose as a result of the special relationship that existed between Defendants and Plaintiff and Class Members. That special relationship arose because Plaintiff and the Class entrusted Defendants with their confidential Private Information, a necessary part of receiving services.

172. Defendants' duty to use reasonable care in protecting confidential data arose not only as a result of the statutes and regulations described above, but also because Defendants are bound by industry standards to protect confidential Private Information.

173. Defendants were subject to an "independent duty," untethered to any contract between Defendant and Plaintiff or the Class.

174. Defendants also had a duty to exercise appropriate practices to remove Private Information they were no longer required to retain pursuant to regulations.

175. Moreover, Defendants had a duty to promptly and adequately notify Plaintiff and the Class of the Data Breach.

176. Defendants had and continue to have a duty to adequately disclose that the Private Information of Plaintiff and the Class within Defendants possession might have been compromised, how it was compromised, and precisely the types of data that were compromised and when. Such notice was necessary to allow Plaintiff and the Class to take steps to prevent, mitigate, and repair any identity theft and the fraudulent use of their Private Information by third parties.

177. Defendants breached their duties, pursuant to the FTC Act and other applicable standards, and thus was negligent, by failing to use reasonable measures to protect Class Members' Private Information. The specific negligent acts and omissions committed by Defendants include, but are not limited to, the following:

a. Failing to adopt, implement, and maintain adequate security measures to safeguard Class Members' Private Information;

b. Failing to adequately monitor the security of their networks and systems;

c. Allowing unauthorized access to Class Members' Private Information;

d. Failing to detect in a timely manner that Class Members' Private Information had been compromised;

e. Failing to remove former Private Information it was no longer required to retain pursuant to regulations, and;

f. Failing to timely and adequately notify Class Members about the Data Breach's occurrence and scope, so that they could take appropriate steps to mitigate the potential for identity theft and other damages.

178. Defendants violated Section 5 of the FTC Act by failing to use reasonable measures to protect Private Information and not complying with applicable industry standards, as described in detail herein. Defendants' conduct was particularly unreasonable given the nature and amount of Private Information they obtained and stored and the foreseeable consequences of the immense damages that would result to Plaintiff and the Class.

179. Defendants' violation of Section 5 of the FTC Act constitutes negligence.

180. Plaintiff and Class Members were within the class of persons the Federal Trade Commission Act was intended to protect and the type of harm that resulted from the Data Breach was the type of harm the statute was intended to guard against.

181. The FTC has pursued enforcement actions against businesses, which, as a result of their failure to employ reasonable data security measures and avoid unfair and deceptive practices, caused the same harm as that suffered by Plaintiff and the Class.

182. A breach of security, unauthorized access, and resulting injury to Plaintiff and the Class was reasonably foreseeable, particularly in light of Defendants' inadequate security practices.

183. It was foreseeable that Defendants' failure to use reasonable measures to protect Class Members' Private Information would result in injury to Class Members. Further, the breach of security was reasonably foreseeable given the known high frequency of cyberattacks and data breaches targeting companies in possession of Private Information.

184. Defendants have full knowledge of the sensitivity of the Private Information and the types of harm that Plaintiff and the Class could and would suffer if the Private Information were wrongfully disclosed.

185. Plaintiff and the Class were the foreseeable and probable victims of any inadequate security practices and procedures. Defendants knew or should have known of the inherent risks in collecting and storing the Private Information of Plaintiff and the Class, the critical importance of providing adequate security of that Private Information, and the necessity for encrypting Private Information stored on Defendants' systems.

186. It was therefore foreseeable that the failure to adequately safeguard Class Members' Private Information would result in one or more types of injuries to Class Members.

187. Plaintiff and the Class had no ability to protect their Private Information that was in, and possibly remains in, Defendants possession.

188. Defendants were in a position to protect against the harm suffered by Plaintiff and the Class as a result of the Data Breach.

189. Defendants' duty extended to protecting Plaintiff and the Class from the risk of foreseeable criminal conduct of third parties, which has been recognized in situations where the actor's own conduct or misconduct exposes another to the risk or defeats protections put in place to guard against the risk, or where the parties are in a special relationship. *See* Restatement

(Second) of Torts § 302B. Numerous courts and legislatures have also recognized the existence of a specific duty to reasonably safeguard personal information.

190. But for Defendants wrongful and negligent breach of duties owed to Plaintiff and the Class, the Private Information of Plaintiff and the Class would not have been compromised.

191. There is a close causal connection between Defendants' failure to implement security measures to protect the Private Information of Plaintiff and the Class and the harm, or risk of imminent harm, suffered by Plaintiff and the Class.

192. The Private Information of Plaintiff and the Class was lost and accessed as the proximate result of Defendants' failure to exercise reasonable care in safeguarding such Private Information by adopting, implementing, and maintaining appropriate security measures.

193. As a direct and proximate result of Defendants negligence, Plaintiff and the Class have suffered and will suffer injury, including but not limited to: (i) invasion of privacy; (ii) theft of their Private Information; (iii) lost or diminished value of Private Information, and lost value of access to that Private Information; (iv) lost time associated with attempting to mitigate the actual consequences of the Data Breach; (v) loss of benefit of the bargain; (vi) lost opportunity costs associated with attempting to mitigate the actual consequences of the Data Breach; (vii) actual misuse of the compromised data consisting of an increase in spam calls, texts, and/or emails; (viii) nominal damages; and (ix) the continued and certainly increased risk to their Private Information, which: (a) remains unencrypted and available for unauthorized third parties to access and abuse; and (b) remains backed up in Defendants possession and is subject to further unauthorized disclosures so long as Defendants fail to undertake appropriate and adequate measures to protect the Private Information.

194. As a direct and proximate result of Defendants' negligence, Plaintiff and the Class have suffered and will continue to suffer other forms of injury and/or harm, including, but not limited to, anxiety, emotional distress, loss of privacy, and other economic and non-economic losses.

195. Additionally, as a direct and proximate result of Defendants' negligence, Plaintiff and the Class have suffered and will suffer the continued risks of exposure of their Private Information, which remain in Defendants' possession and is subject to further unauthorized disclosures so long as Defendants fail to undertake appropriate and adequate measures to protect the Private Information in their continued possession.

196. Plaintiff and Class Members are entitled to compensatory and consequential damages suffered as a result of the Data Breach.

197. Defendants' negligent conduct is ongoing, in that they still hold the Private Information of Plaintiff and Class Members in an unsafe and insecure manner.

198. Plaintiff and Class Members are also entitled to injunctive relief requiring Defendants to (i) strengthen their data security systems and monitoring procedures; (ii) submit to future annual audits of those systems and monitoring procedures; and (iii) provide adequate identity protection services to all Class Members.

## COUNT II
## Negligence Per Se
## (On Behalf of Plaintiff and the Class against Defendants)

199. Plaintiff realleges and incorporates by reference paragraphs 1 through 162 as if fully set forth herein.

200. Section 5 of the FTC Act, 15 U.S.C. § 45, prohibits "unfair . . . practices in or affecting commerce" including, as interpreted and enforced by the FTC, the unfair act or practice

by Defendants of failing to use reasonable measures to protect Private Information. Various FTC publications and orders also form the basis of Defendants duty.

201. Defendants violated Section 5 of the FTC Act (and similar state statutes) by failing to use reasonable measures to protect Private Information and not complying with industry standards. Defendants' conduct was particularly unreasonable given the nature and amount of Private Information obtained and stored and the foreseeable consequences of a data breach on Defendants' systems.

202. Defendants' violation of Section 5 of the FTC Act (and similar state statutes) constitutes negligence *per se.*

203. Plaintiff and Class members are consumers within the class of persons Section 5 of the FTC Act (and similar state statutes) were intended to protect.

204. Moreover, the harm that has occurred is the type of harm the FTC Act (and similar state statutes) was intended to guard against. Indeed, the FTC has pursued over fifty enforcement actions against businesses which, as a result of their failure to employ reasonable data security measures and avoid unfair and deceptive practices, caused the same harm suffered by Plaintiff and Class Members.

205. As a direct and proximate result of Defendants' conduct, Plaintiff and Class Members have suffered or will suffer injury, including but not limited to: (i) invasion of privacy; (ii) theft of their Private Information; (iii) lost or diminished value of Private Information; (iv) lost time associated with attempting to mitigate the actual consequences of the Data Breach; (v) loss of benefit of the bargain; (vi) lost opportunity costs associated with attempting to mitigate the actual consequences of the Data Breach; (vii) actual misuse of the compromised data consisting of an increase in spam calls, texts, and/or emails; (viii) nominal damages; and (ix) the continued and

certainly increased risk to their Private Information, which: (a) remains unencrypted and available for unauthorized third parties to access and abuse; and (b) remains backed up in Defendants' possession and is subject to further unauthorized disclosures so long as Defendants fail to undertake appropriate and adequate measures to protect the Private Information.

206. Plaintiff and Class Members have been injured and are entitled to damages in an amount to be proven at trial.

**COUNT III**
**Unjust Enrichment**
**(On Behalf of Plaintiff and the Class against Defendants)**

207. Plaintiff realleges and incorporates by reference paragraphs 1 through 162 as if fully set forth herein.

208. Plaintiff and Class Members conferred a monetary benefit on Defendants. Specifically, they provided Defendants, either directly or indirectly, with their Private Information. In exchange, Plaintiff and Class Members should have had their Private Information protected with adequate data security.

209. Defendants knew that Plaintiff and Class Members conferred a benefit upon it and accepted and retained that benefit by accepting and retaining the Private Information entrusted to them. Defendants profited from Plaintiff's data and used Plaintiff's and Class Members' Private Information for business purposes.

210. Defendants failed to secure Plaintiff's and Class Members' Private Information and, therefore, did not fully compensate Plaintiff or Class Members for the value that their Private Information provided.

211. Defendants acquired the Private Information through inequitable record retention as they failed to investigate and/or disclose the inadequate data security practices previously alleged.

212. If Plaintiff and Class Members had known that Defendants would not use adequate data security practices, procedures, and protocols to adequately monitor, supervise, and secure their Private Information, they would not have entrusted their Private Information to Defendants.

213. Plaintiff and Class Members have no adequate remedy at law.

214. Defendants enriched themselves by saving the costs they reasonably should have expended on data security measures to secure Plaintiff's and Class Members' Personal Information. Instead of providing a reasonable level of security that would have prevented the hacking incident, Defendants instead calculated to increase their own profit at the expense of Plaintiff and Class Members by utilizing cheaper, ineffective security measures and diverting those funds to their own profit. Plaintiff and Class Members, on the other hand, suffered as a direct and proximate result of Defendants decision to prioritize their own profits over the requisite security and the safety of their Private Information.

215. Under the circumstances, it would be unjust for Defendants to be permitted to retain any of the benefits that Plaintiff and Class Members conferred upon them.

216. As a direct and proximate result of Defendants' conduct, Plaintiff and Class Members have suffered and will suffer injury, including but not limited to: (i) invasion of privacy; (ii) theft of their Private Information; (iii) lost or diminished value of Private Information; (iv) lost time associated with attempting to mitigate the actual consequences of the Data Breach; (v) loss of benefit of the bargain; (vi) lost opportunity costs associated with attempting to mitigate the actual consequences of the Data Breach; (vii) actual misuse of the compromised data consisting of

an increase in spam calls, texts, and/or emails; (viii) nominal damages; and (ix) the continued and certainly increased risk to their Private Information, which: (a) remains unencrypted and available for unauthorized third parties to access and abuse; and (b) remains backed up in Defendants possession and is subject to further unauthorized disclosures so long as Defendants fail to undertake appropriate and adequate measures to protect the Private Information.

217. Plaintiff and Class Members are entitled to full refunds, restitution, and/or damages from Defendants and/or an order proportionally disgorging all profits, benefits, and other compensation obtained by Defendants from wrongful conduct. This can be accomplished by establishing a constructive trust from which the Plaintiff and Class Members may seek restitution or compensation.

218. Plaintiff and Class Members may not have an adequate remedy at law against Defendants, and accordingly, they plead this claim for unjust enrichment in addition to, or in the alternative to, other claims pleaded herein.

**COUNT IV**
**Breach of Implied Contract**
**(On Behalf of Plaintiff and the Class against Defendants)**

219. Plaintiff realleges and incorporates by reference paragraphs 1 through 162 as if fully set forth herein.

220. Plaintiff and Class Members were required to provide Defendants with their Private Information in order to receive services.

221. When Plaintiff and Class Members provided their Private Information to Defendants when seeking services, they entered into implied contracts in which Defendants agreed to comply with its statutory and common law duties to protect their Private Information and to timely notify them in the event of a Data Breach.

222. Based on Defendants representations, legal obligations, and acceptance of Plaintiff and the Class Members' Private Information, Defendants had an implied duty to safeguard their Private Information through the use of reasonable industry standards. Upon information and belief, this implied duty was reinforced by Defendants' representations in their privacy policy.

223. Defendants breached the implied contracts by failing to safeguard Plaintiff's and Class Members' Private Information and failing to provide them with timely and accurate notice of the Data Breach.

224. As a direct and proximate result of Defendants breach of implied contract, Plaintiff and the Class Members have suffered damages, including foreseeable consequential damages that Defendants knew about when they requested Plaintiff and the Class Members' Personal Information.

**COUNT V**
**Illinois Consumer Fraud and Deceptive Business Practices Act,**
**815 Ill. Comp. Stat. §§ 505, *et seq.* ("Illinois CPA")**
**(On Behalf of Plaintiff, the Nationwide Class, and the Illinois Subclass against Defendants)**

225. Plaintiff realleges and incorporates by reference paragraphs 1 through 162 as if fully set forth herein.

226. Defendants are "persons" as defined by 815 Ill. Comp. Stat. §§ 505/1(c).

227. Plaintiff and Class members are "consumers" as defined by 815 Ill. Comp. Stat. §§ 505/1(e).

228. Defendants' conduct as described herein was in the conduct of "trade" or commerce" as defined by 815 Ill. Comp. Stat. § 505/1(f).

229. Defendants' deceptive, unfair, and unlawful trade acts or practices, in violation of 815 Ill. Comp. Stat. § 505/2, include:

a. Failing to implement and maintain reasonable security and privacy measures to

protect Plaintiff's and Class members' Private Information, which was a direct and proximate cause of the Data Breach;

b. Failing to identify foreseeable security and privacy risks, remediate identified security and privacy risks, and adequately improve security and privacy measures following previous cybersecurity incidents, which was a direct and proximate cause of the Data Breach;

c. Failing to comply with common law and statutory duties pertaining to the security and privacy of Plaintiff's and Class members' PII/PHI, including duties imposed by the FTC Act, 15 U.S.C. § 45, HIPAA, 42 U.S.C. § 1320d, the Illinois Personal Information Protection Act, 815 Ill. Comp. Stat. §§ 530/10(a), *et seq.*, and Illinois laws regulating the use and disclosure of Social Security Numbers, 815 Ill. Comp. Stat § 505/2RR, which was a direct and proximate cause of the Data Breach;

d. Misrepresenting that they would protect the privacy and confidentiality of Plaintiff's and Class members' PII/PHI, including by implementing and maintaining reasonable security measures;

e. Misrepresenting that they would comply with common law and statutory duties pertaining to the security and privacy of Plaintiff's and Class members' PII/PHI, including duties imposed by the FTC Act, 15 U.S.C. § 45, HIPAA, 42 U.S.C. § 1320d, *et seq*, the Illinois Personal Information Protection Act, 815 Ill. Comp. Stat. §§ 530/10(a), *et seq.*, and Illinois laws regulating the use and disclosure of Social Security Numbers, 815 Ill. Comp. Stat § 505/2RR;

f. Failing to timely and adequately notify Plaintiff and Class members of the Breach;

g. Omitting, suppressing, and concealing the material fact that they did not reasonably

or adequately secure Plaintiff's and Class members' PII/PHI; and

h. Omitting, suppressing, and concealing the material fact that they did not comply with common law and statutory duties pertaining to the security and privacy of Plaintiff's and Class members' PII/PHI, including duties imposed by the FTC Act, 15 U.S.C. § 45, HIPAA, 42 U.S.C. § 1320d, the Illinois Personal Information Protection Act, 815 Ill. Comp. Stat. §§ 530/10(a), *et seq.*, and Illinois laws regulating the use and disclosure of Social Security Numbers, 815 Ill. Comp. Stat § 505/2RR.

230. Defendants' representations and omissions were material because they were likely to deceive reasonable consumers about the adequacy of Defendants' data security and ability to protect the confidentiality of consumers' PII/PHI.

231. Defendants intended to mislead Plaintiff and Class members and induce them to rely on their misrepresentations and omissions. Plaintiff and Class members reasonably relied on Defendants to advise them if their data security and data storage systems were not adequately secure to protect their PII/PHI, the truth of which they could not otherwise have discovered.

232. Additionally, Defendants are "Data Collectors" as defined in 815 Ill. Comp. Stat.§ 530/5, as corporations that handled, collected, disseminated, and otherwise dealt with nonpublic PII/PHI.

233. Plaintiff and Class members' PII/PHI (e.g. Social Security numbers, medical information, and health insurance information) includes personal information as covered under 815 Ill. Comp. Stat. § 530/5.

234. As Data Collectors, Defendants were required to notify Plaintiff and Class members of a breach of its data security system in the most expedient time possible and without unreasonable

delay pursuant to the Illinois Personal Information Protection Act, 815 Ill. Comp. Stat. § 530/10(a), *et seq*.

235. By failing to disclose the Data Breach in the most expedient time possible and without unreasonable delay, Defendants violated 815 Ill. Comp. Stat. § 530/10(a).

236. Pursuant to 815 Ill. Comp. Stat. § 530/20, a violation of 815 Ill. Comp. Stat. § 530/10(a) constitutes an unlawful practice under the Illinois Consumer Fraud and Deceptive Business Practices Act.

237. As a direct and proximate result of Defendants' violation of 815 Ill. Comp. Stat. § 530/10(a), Plaintiff and Class members suffered damages, as described above.

238. The above unfair and deceptive practices and acts by Defendants were immoral, unethical, oppressive, and unscrupulous. These acts caused substantial injury that these consumers could not reasonably avoid; this substantial injury outweighed any benefits to consumers or to competition.

239. Defendants acted intentionally, knowingly, and maliciously to violate Illinois's CPA, and recklessly disregarded Plaintiff and Class members' rights.

240. As a direct and proximate result of Defendants' unfair, unlawful, and deceptive acts and practices, Plaintiff and Class members have suffered and will continue to suffer injury, ascertainable losses of money or property, and monetary and non-monetary damages, including from fraud and identity theft; time and expenses related to monitoring their financial accounts for fraudulent activity; an increased, imminent risk of fraud and identity theft; and loss of value of their Private Information.

241. Plaintiff and Class members seek all monetary and non-monetary relief allowed by law, including damages under 815 Ill. Comp. Stat. Ann. 505/10a(a); injunctive relief and

reasonable attorney's fees and costs under 815 Ill. Comp. Stat. Ann. 505/10a(c); and any other relief that is just and proper, and are accordingly entitled to damages in amounts to be proven at trial.

**COUNT VI**
**Illinois Uniform Deceptive Trade Practices Act,**
**815 Ill. Comp. Stat. §§510/1, *et seq.***
**(On Behalf of Plaintiff, the Nationwide Class, and the Illinois Subclass against Defendants)**

242. Plaintiff realleges and incorporates by reference paragraphs 1 through 162 as if fully set forth herein.

243. Defendants are "persons" as defined by 815 Ill. Comp. Stat. § 510/1(5).

244. Defendants engaged in deceptive trade practices in the conduct of its business, in violation of 815 Ill. Comp. Stat. § 510/2(a), including:

a. Representing that goods are services have characteristics that they do not have;

b. Representing that goods or services are of a particular standard, quality, or grade if they are of another;

c. Advertising goods or services with intent not to sell them as advertised; and

d. Engaging in other conduct that creates a likelihood of confusion or misunderstanding.

245. Defendants' deceptive trade practices include:

a. Failing to implement and maintain reasonable security and privacy measures to protect Plaintiff's and Class members' Private Information, which was a direct and proximate cause of the Data Breach;

b. Failing to identify foreseeable security and privacy risks, remediate identified security and privacy risks, and adequately improve security and privacy measures following previous cybersecurity incidents, which was a direct and proximate cause

of the Data Breach;

c. Failing to comply with common law and statutory duties pertaining to the security and privacy of Plaintiff's and Class members' Private Information, including duties imposed by the FTC Act, 15 U.S.C. § 45, HIPAA, 42 U.S.C. § 1320d, the Illinois Personal Information Protection Act, 815 Ill. Comp. Stat. §§ 530/10(a), *et seq.*, and Illinois laws regulating the use and disclosure of Social Security numbers, 815 Ill. Comp. Stat § 505/2RR, which was a direct and proximate cause of the Data Breach;

d. Misrepresenting that they would protect the privacy and confidentiality of Plaintiff's and Class members' PII/PHI, including by implementing and maintaining reasonable security measures;

e. Misrepresenting that it would comply with common law and statutory duties pertaining to the security and privacy of Plaintiff's and Class members' PII/PHI, including duties imposed by the FTC Act, 15 U.S.C. § 45, HIPAA, 42 U.S.C. § 1320d, the Illinois Personal Information Protection Act, 815 Ill. Comp. Stat. §§ 530/10(a), *et seq.*, and Illinois laws regulating the use and disclosure of Social Security numbers, 815 Ill. Comp. Stat § 505/2RR;

f. Failing to timely and adequately notify Plaintiff's and Class members of the Data Breach;

g. Omitting, suppressing, and concealing the material fact that they did not reasonably or adequately secure Plaintiff's and Class members' PII/PHI; and

h. Omitting, suppressing, and concealing the material fact that it did not comply with common law and statutory duties pertaining to the security and privacy of Plaintiff's and Class members' PII/PHI, including duties imposed by the FTC Act,

15 U.S.C. § 45, HIPAA, 42 U.S.C. § 1320d, the Illinois Personal Information Protection Act, 815 Ill. Comp. Stat. §§ 530/10(a), *et seq.*, and Illinois laws regulating the use and disclosure of Social Security numbers, 815 Ill. Comp. Stat § 505/2RR.

246. Defendants' representations and omissions were material because they were likely to deceive reasonable consumers about the adequacy of Defendants' data security and ability to protect the confidentiality of consumers' Private Information.

247. The above unfair and deceptive practices acts by Defendants were willful, immoral, unethical, oppressive, and unscrupulous. These acts caused and will continue to cause substantial injury to Plaintiff and Class members that they could not reasonably avoid; this substantial injury outweighed any benefits to consumers or to competition.

248. As a direct and proximate result of Defendants' willful, unfair, unlawful, and deceptive trade practices, Plaintiff and Class members have suffered and will continue to suffer injury, ascertainable losses of money or property, and monetary and non-monetary damages, including from fraud and identify theft; time and expenses related to monitoring their financial accounts for fraudulent activity, an increased, imminent risk of fraud and identity theft; and loss of value of their PII/PHI.

249. Plaintiff and Class members seek all monetary and nonmonetary relief allowed by law, including injunctive relief and attorneys' fees and costs under 815 Ill. Comp. Stat. Ann. § 510/3; and any other relief that is just and proper, and are accordingly entitled to damages in amounts to be proven at trial.

## COUNT VII
**Violation of the Michigan Consumer Protection Act**
**(Mich. Comp. Laws Ann. § 445.901 et seq.)**
**(On Behalf of Plaintiff and the Michigan Subclass against Defendants)**

250. Plaintiff realleges and incorporates by reference paragraphs 1 through 162 as if fully set forth herein.

251. Plaintiff and the Michigan Subclass are "persons" as defined by Mich. Comp. Laws Ann. § 445.902(d).

252. Defendants advertised, offered, or sold goods or services in Michigan and engaged in trade or commerce directly or indirectly affecting the people of Michigan, as defined by Mich. Comp. Laws Ann. § 445.902(g).

253. Defendants engaged in unfair, unconscionable, and deceptive practices in the conduct of trade and commerce, in violation of Mich. Comp. Laws Ann. § 445.903(1), including:

a. Representing that their goods and services have characteristics, uses, and benefits that they do not have, in violation of Mich. Comp. Laws Ann. § 445.903(1)(c);

b. Representing that their goods and services are of a particular standard or quality if they are of another in violation of Mich. Comp. Laws Ann. § 445.903(1)(e);

c. Making a representation or statement of fact material to the transaction such that a person reasonably believes the represented or suggested state of affairs to be other than it actually is, in violation of Mich. Comp. Laws Ann. § 445.903(1)(bb); and

d. Failing to reveal facts that are material to the transaction in light of representations of fact made in a positive matter, in violation of Mich. Comp. Laws Ann. § 445.903(1)(cc).

254. Defendants' unfair, unconscionable, and deceptive practices include:

a. Failing to implement and maintain reasonable security and privacy measures to protect the PII of Plaintiff and the Michigan Subclass, which was a direct and proximate cause of the Data Breach;

b. Failing to identify foreseeable security and privacy risks, remediate identified security and privacy risks, and adequately improve security and privacy measures following previous cybersecurity incidents, which was a direct and proximate cause of the Data Breach;

c. Failing to comply with common law and statutory duties pertaining to the security and privacy of the PII of Plaintiff and the Michigan Subclass, including duties imposed by the FTC Act, the GLBA, the Privacy Rule, Regulation P, and the Safeguards Rule, which was a direct and proximate cause of the Data Breach;

d. Misrepresenting that it would protect the privacy and confidentiality of the PII of Plaintiff and the Michigan Subclass, including by implementing and maintaining reasonable security measures;

e. Misrepresenting that it would comply with common law and statutory duties pertaining to the security and privacy of the PII of Plaintiff and the Michigan Subclass, including duties imposed by the FTC Act, the GLBA, the Privacy Act, Regulation P, and the Safeguards Rule;

f. Omitting, suppressing, and concealing the material fact that it did not reasonably or adequately secure the PII of Plaintiff and the Michigan Subclass; and

g. Omitting, suppressing, and concealing the material fact that it did not comply with common law and statutory duties pertaining to the security and privacy of the PII of

Plaintiff and the Michigan Subclass, including duties imposed by the FTC Act, the GLBA, the Privacy Act, Regulation P, and the Safeguards Rule.

255. Defendants' representations and omissions were material because they were likely to deceive reasonable consumers about the adequacy of Defendants' data security and ability to protect the confidentiality of consumers' PII.

256. Defendants intended to mislead Plaintiff and the Michigan Subclass and induce them to rely on its misrepresentations and omissions.

257. Defendants acted intentionally, knowingly, and maliciously to violate Michigan's Consumer Protection Act, and recklessly disregarded the rights of Plaintiff and the Michigan Subclass.

258. As a direct and proximate result of Defendants' unfair, unconscionable, and deceptive practices, Plaintiff and the Michigan Subclass have suffered and will continue to suffer injury, ascertainable losses of money or property, and monetary and non-monetary damages, including loss of the benefit of their bargain with Defendants as they would not have paid Defendants for goods and services or would have paid less for such goods and services but for Defendants violations alleged herein; losses from fraud and identity theft; costs for credit monitoring and identity protection services; time and expenses related to monitoring their financial accounts for fraudulent activity; loss of value of their PII; and an increased, imminent risk of fraud and identity theft.

259. Plaintiff and the Michigan Subclass seek actual damages on behalf of the Michigan Subclass, together with declaratory, injunctive, and other relief available under Mich. Comp. Laws § 445.911, and any other relief that is just and proper.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff, on behalf of himself, and all Class Members, request judgment against Defendants and that the Court grants the following:

A. For an order certifying the Class and Subclasses, as defined herein, and appointing Plaintiff and his Counsel to represent the Class;

B. For equitable relief enjoining Defendants from engaging in the wrongful conduct complained of herein pertaining to the misuse and/or disclosure of the Private Information of Plaintiff and Class Members, and from refusing to issue prompt, complete, and accurate disclosures to Plaintiff and Class Members;

C. For injunctive relief requested by Plaintiff, including but not limited to, injunctive and other equitable relief as is necessary to protect the interests of Plaintiff and Class Members, including but not limited to an order:

   i. prohibiting Defendants from engaging in the wrongful and unlawful acts described herein;

   ii. requiring Defendants to protect, including through encryption, all data collected through the course of their business in accordance with all applicable regulations, industry standards, and federal, state, or local laws;

   iii. requiring Defendants to delete, destroy, and purge the personal identifying information of Plaintiff and Class Members unless Defendants can provide to the Court reasonable justification for the retention and use of such information when weighed against the privacy interests of Plaintiff and Class Members;

iv. requiring Defendants to implement and maintain a comprehensive Information Security Program designed to protect the confidentiality and integrity of the Private Information of Plaintiff and Class Members;

v. prohibiting Defendants from maintaining the Private Information of Plaintiff and Class Members on a cloud-based database;

vi. requiring Defendants to engage independent third-party security auditors/penetration testers as well as internal security personnel to conduct testing, including simulated attacks, penetration tests, and audits on Defendants' systems on a periodic basis, and ordering Defendant to promptly correct any problems or issues detected by such third-party security auditors;

vii. requiring Defendants to engage independent third-party security auditors and internal personnel to run automated security monitoring;

viii. requiring Defendants to audit, test, and train its security personnel regarding any new or modified procedures;

ix. requiring Defendants to segment data by, among other things, creating firewalls and access controls so that if one area of Defendants network is compromised, hackers cannot gain access to other portions of Defendants' systems;

x. requiring Defendants to conduct regular database scanning and securing checks;

xi. requiring Defendants to establish an information security training program that includes at least annual information security training for all employees,

with additional training to be provided as appropriate based upon the employees' respective responsibilities with handling personal identifying information, as well as protecting the personal identifying information of Plaintiff and Class Members;

xii. requiring Defendants to conduct internal training and education routinely and continually, and on an annual basis to inform internal security personnel how to identify and contain a breach when it occurs and what to do in response to a breach;

xiii. requiring Defendants to implement a system of tests to assess their employees’ knowledge of the education programs discussed in the preceding subparagraphs, as well as randomly and periodically testing employees’ compliance with Defendants’ policies, programs, and systems for protecting personal identifying information;

xiv. requiring Defendants to implement, maintain, regularly review, and revise as necessary a threat management program designed to appropriately monitor Defendants information networks for threats, both internal and external, and assess whether monitoring tools are appropriately configured, tested, and updated;

xv. requiring Defendants to meaningfully educate all Class Members about the threats that they face as a result of the loss of their confidential Private Information to third parties, as well as the steps affected individuals must take to protect themselves;

xvi. requiring Defendants to implement logging and monitoring programs sufficient to track traffic to and from Defendants servers; and for a period of 10 years, appointing a qualified and independent third-party assessor to conduct a SOC 2 Type 2 attestation on an annual basis to evaluate Defendants compliance with the terms of the Court's final judgment, to provide such report to the Court and to counsel for the class, and to report any deficiencies with compliance of the Court's final judgment;

D. For an award of damages, including actual, nominal, and consequential damages, as allowed by law in an amount to be determined;

E. For an award of attorneys' fees and costs as allowed by law;

F. For prejudgment interest on all amounts awarded; and

G. Such other and further relief as this Court may deem just and proper.

**JURY TRIAL DEMAND**

Plaintiff hereby demands a jury trial for all claims so triable.

Dated: August 24, 2026

Respectfully submitted,

*/s/ Norman E. Siegel*
Norman E. Siegel, MO #44378
*(pro hac vice forthcoming)*
Barrett J. Vahle, MO #56674
*(pro hac vice forthcoming)*
Matthew J. Elliott, MO #74644
*(pro hac vice forthcoming)*
**STUEVE SIEGEL HANSON LLP**
460 Nichols Rd., Ste. 200
Kansas City, MO 64112
T: (816) 714-7100
siegel@stuevesiegel.com
vahle@stuevesiegel.com
elliott@stuevesiegel.com

/s/ *Gary Klinger*
Gary Klinger (ARDC No. 6303726)
**MILBERG PLLC**
227 West Monroe Street, Suite 2100
Chicago, IL 60606
T: (866) 252-0878
gklinger@milberg.com

*Attorneys for Plaintiff*